IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-CR-30058 |
| | ) | |
| EDDIE LEE, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This cause comes before the Court on Defendant Eddie Lee's Motion to Quash Arrest and Suppress Evidence (d/e 30) (Motion). The Motion is fully briefed, and pursuant to Local Rule 72.1, and August 2, 2010 Standing Order, the matter has been referred to me for an evidentiary hearing and Report and Recommendation. An evidentiary hearing was held on November 8, 2010. After carefully considering all of the submissions of the parties, hearing evidence on the matter, and pursuant to 28 U.S.C. § 636(b)(1)(B), IT IS RECOMMENDED that the Motion be DENIED.

# I. BACKGROUND[1]

On December 2, 2009, at approximately 10:15 a.m., Defendant Eddie Lee was driving a black 2000 Honda Accord (Accord) southbound on Interstate 55 (I-55) in McLean, County, Illinois.  Lee had borrowed the Accord from his goddaughter Kimberly Love.  At that time, McLean County Deputy Sheriff Tuttle was patrolling I-55 between mile markers 145 and 157 in McLean County.  Deputy Tuttle was patrolling as part of a drug interdiction patrol.  Deputy Tuttle and his drug sniffing dog Keej were certified to work together to detect the odor of narcotics.  <u>Government Exhibit 3, Certificate of Training</u>.  Deputy Tuttle had Keej in his squad car while he was on patrol on December 2, 2009.

Deputy Tuttle saw the Accord and decided to check the registration of the vehicle.  Deputy Tuttle testified at the hearing that he selected the Accord at random.  He stated that he randomly checked the registration of several vehicles that day while he was on patrol.  Deputy Tuttle drove behind the Accord and entered the license plate number into a computer data search system called LEADS.  The LEADS system returned a message stating that the registration was suspended.  The message stated

---

[1]This Report and Recommendation is prepared without the benefit of a transcript.

that the registration was suspended for safety and financial responsibility.

Deputy Tuttle testified that the "safety and financial responsibility" notation

indicated that the registration was suspended for lack of insurance or for

failure to pass a vehicle inspection required in the Chicagoland area of the

state.

Deputy Tuttle initiated a traffic stop based on the suspended

registration (First Stop).  Deputy Tuttle reported to dispatch at 10:18 a.m.

that he was initiating a traffic stop at I-55 mile marker 157.  See

Government Exhibit 4, LEA Agency Incident Report (Incident Report), at 3.

Lee pulled the Accord over to the shoulder of Interstate 55 and stopped.

Deputy Tuttle parked his squad car on the shoulder behind the Accord.

Deputy Tuttle exited the squad car and walked to the passenger door

of the Accord.  Deputy Tuttle asked for Lee's driver's license, vehicle

registration, and proof of insurance.  Lee gave Deputy Tuttle his driver's

license, but explained that he had borrowed the car and did not have

registration or proof of insurance.  Deputy Tuttle walked back to the squad

car and ran Lee's driver's license number through the LEADS system.  The

system showed that Lee's driver's license was valid.  The system also

showed that Lee had a criminal arrest record that included multiple drug

arrests.  Deputy Tuttle then contacted his dispatch for an FBI number on Lee.  The dispatcher got the number and ran it.  The information showed that Lee's last arrest was in 2003.

McLean County Detective Chad Witkowski arrived at the scene at 10:21 a.m.  Detective Witkowski was also patrolling I-55 as part of the drug interdiction patrol.  Detective Witkowski heard Deputy Tuttle's call to dispatch stating that he was initiating a traffic stop, and Detective Witkowski responded as back-up.  By the time Detective Witkowski arrived, Deputy Tuttle had gone to the Accord, secured Lee's driver's license, and was back in his squad car.  Detective Witkowski walked up to Deputy Tuttle's squad car.  Deputy Tuttle told Detective Witkowski that he going to walk his dog Keej around the Accord to check for the odor of drugs.

Deputy Tuttle went back to the Accord and asked Lee to exit the vehicle.  Deputy Tuttle told Lee that he was not going to issue a citation since Lee did not know that the registration was suspended, but he was going to walk his sniffing dog Keej around the Accord to check for the odor of drugs. Deputy Tuttle detained Lee and directed him to stand by Detective Witkowski on a grassy area along the side of the road.  Detective Witkowski watched Lee and also watched for oncoming traffic.

Deputy Tuttle and his dog started at the front of the Accord and moved along the passenger side of the vehicle. Keej alerted on the passenger door. Keej alerted by scratching at the door. Deputy Tuttle then returned Keej to his squad car without completing the walk around the rest of the Accord. Deputy Tuttle told Lee that the dog alerted on the Accord and they were going to search the vehicle.

The officers then searched the Accord. Detective Witkowski searched the passenger side of the car and the trunk. Deputy Tuttle searched the driver's side and the front of the vehicle under the hood. Deputy Tuttle observed cell phones in the car. Detective Witkowski remembered seeing one cell phone in the vehicle. Deputy Tuttle also assisted in searching the trunk.

The trunk was filled with bags of clothing and miscellaneous items. A gas can was also in the trunk. Among the items in the trunk, Lee claimed a hiking bag and a bag containing a chess set as his. The officers looked through the bags and clothing. Detective Tuttle lifted the carpet and board that covered the spare tire well. Detective Witkowski inspected the well visually. He lifted the edge of the tire close to him with one hand and

looked under the tire. He did not remove the tire from the well. He did not find any drugs in the spare tire well or the rest of the trunk.

Deputy Tuttle then told Lee that the Accord was going to be towed because he was not the owner and the registration was suspended. At 10:38 a.m., Deputy Tuttle called for a tow truck to tow the Accord. Incident Report, at 3. The officers offered to drive Lee north to Bloomington or south to the Funk's Grove rest stop. Lee elected to go to the Funk's Grove rest stop. Detective Witkowski drove Lee to the rest stop at 10:47 a.m. Id. Lee was allowed to take his chess set and other belongings with him when he left. Brown's Wrecker Service (Brown's) responded to the call for a tow truck and towed the Accord away at 10:53 a.m. Id. The tow truck took the Accord to Brown's impound lot.

At 2:00 p.m., the Drug Enforcement Agency (DEA) put a hold on the Accord. Deputy Tuttle was told that the DEA was attempting to get a warrant to search the Accord and wanted Deputy Tuttle to do a second walk around search with Keej. Deputy Tuttle went to Brown's impound lot to conduct another walk around search. The dog again alerted on the passenger door.

DEA Special Agent Akil Smith, of the ISP/DEA Task Force from Urbana, Illinois, was preparing the application for the search warrant. Deputy Tuttle talked to Special Agent Smith. Deputy Tuttle told Special Agent Smith what happened at the First Stop. Special Agent Smith also talked to McLean County Detective Chris Renken. Detective Renken arrived at Brown's impound lot to assist in anticipation of the warrant. Detective Renken spoke to a representative of Brown's about the Accord. Detective Renken testified at the hearing that he could not remember the name of the person to whom he spoke. The individual told Detective Renken that the owner of the Accord had called Brown's numerous times to ask that the Accord be towed back to Chicago. Detective Renken recalled that the individual made a comment that the tow would cost more than the value of the car. Detective Renken relayed this information to Special Agent Smith.

Bradley Brown, the owner and manager of Brown's, testified at the hearing. He stated that he was not interviewed for a search warrant. He also testified that he could not recall whether he spoke to any law enforcement officer about the Accord. He recalled that the owner called and asked that the car be towed to Chicago. Brown estimated the tow to

cost $508.00. He said that this was an unusual request to tow a vehicle to Chicago, but he also said that his company regularly towed vehicles back to their owners.[2]

Special Agent Smith then prepared the Complaint for Warrant, which included his affidavit (Warrant Affidavit). The Warrant Affidavit was extensive and recited information from months of investigation of Lee and others. The Warrant Affidavit stated, inter alia, that:

(1)     A confidential source (CS) had purchased cocaine in the past from an individual named Darin Hurt, of Springfield, Illinois;

(2)     The CS stated that Lee was Hurt's source and that Lee drove a black Honda or Toyota at one point;

(3)     Lee was observed driving a gray Ford Taurus on later occasions;

(4)     Another confidential source (CS 2) reported that a man named Michael Smith distributed drugs in Jacksonville, and that Hurt supplied Smith with cocaine;

(5)     In September 2009, the CS conducted two controlled buys of crack cocaine from Hurt at Hurt's residence in Springfield, Illinois. Both

---

[2]Kimberly Love, the owner, and Bradley Brown both testified that the Accord was towed back to Chicago on December 7, 2009.

buys were audio/video recorded and the material purchased tested positive for cocaine;

(6) In October 2009, law enforcement officers observed Lee arrive at Hurt's residence in Springfield during their surveillance of Hurt;

(7) In October 2009, officers observed Lee's vehicle parked outside of the residence of Michael Smith's mother in Springfield, Illinois. Law enforcement officers received information that Lee stayed at that residence when he was in Springfield;

(8) The CS reported on November 24, 2009, that he was present in the home of Michael Smith's mother when Michael Smith told Hurt that Lee would be traveling to Jacksonville, Illinois, with a supply of crack cocaine for Michael Smith on November 27 or 28, 2009;

(9) On November 25, 2009, the CS was present when Michael Smith met with Hurt at Hurt's residence in Springfield. After Smith left, Hurt told the CS that Lee had delivered the crack cocaine to Smith in Jacksonville. Hurt asked CS to give him a ride because Hurt is confined to a wheel chair and does not drive;

(10) On December 2, 2009, Deputy Tuttle and Detective Witkowski conducted the First Stop. Deputy Tuttle reported to Special Agent

Smith that (a) his canine positively alerted on the Accord for the presence of drug odor, (b) he observed three cell phones in the Accord and one in particular rang throughout the traffic stop, (c) a small area of carpet was removed in the trunk exposing the fuel sending unit, (d) he did not find any contraband in the Accord, and (e) he did not disassemble any components of the Accord during the search;

(11)   On December 2, 2009, the CS agreed to drive Hurt to Jacksonville to get drugs;

(12)   The CS contacted officers later on December 2, 2009, to notify them that plans had changed and the CS and Hurt were driving north on I-55 to meet Lee;

(13)   Later on December 2, 2009, ISP officers stopped the vehicle driven by the CS southbound of I-55 near Sherman, Illinois, south of Bloomington (Second Traffic Stop).  Hurt and Lee were both in the vehicle.  The CS and Hurt had gone to pick up Lee at the rest area where Detective Witkowski had left him.  The ISP officers completed the traffic stop and allowed the CS, Hurt, and Lee to continue on their trip;

(14)  Thirty minutes after the Second Traffic Stop, Lee told the CS that the McLean County Deputy Sheriffs searched the Accord twice, but did not find the drugs hidden within.  Lee also said he was sending someone to get the Accord as soon as possible;

(15)  DEA agents then contacted the McLean County Sheriff's Office to confirm that the Accord was impounded; and

(16)  McLean County Detective Chris Renken reported that (a) Brad Brown of Brown's told Detective Renken that the owner of the Accord, Kimberly Love, called several times and wanted the Accord towed back to Chicago, and (b) Brown stated that the tow bill would be more expensive than the value of the Accord.

Government Exhibit 5, Warrant Affidavit, D.8-D.19, D.21-24, D.27-D.28. The Warrant Affidavit requested a warrant to search the Accord.  McLean County Associate Circuit Judge Casy Costigan issued the Warrant.

Deputy Tuttle participated in the search of the Accord pursuant to the warrant.  Crack cocaine was found under the spare tire.  Deputy Tuttle testified that Government Exhibit 6 was a photograph taken at the time of the search and that the photograph showed the location where the drugs were found.  The photograph shows that the drugs were found in an

opaque plastic bag in the spare tire well behind the spare tire in the portion of the well that is closest to the back seat of the vehicle.

## II. ANALYSIS AND CONCLUSIONS OF LAW

Lee moves to suppress the drugs and other evidence found during the search of the Accord conducted pursuant to the search warrant. Lee claims in the Motion that the First Stop was unlawful because (1) the officers detained him an unreasonable length of time before conducting the search, (2) the dog did not alert on the Accord, and so, the officers lacked probable cause to search the vehicle, and (3) the search exceeded the proper scope of a search of a vehicle incident to arrest. Lee's counsel also orally supplemented the Motion to challenge whether the initial traffic stop was valid.[3] Lee argues that the evidence found during the second search should be barred as the fruit of the poisonous tree because the warrant was based on information illegally obtained during the First Stop. See Wong Sun v. United States, 371 U.S. 471 (1963).

Lee also asserts that the Warrant Affidavit contained materially false information that Special Agent Smith knew or should have known was false. For reasons that will be explained more fully below, the Court

---

[3]The Government stated that it was prepared to address the issue of the validity of the traffic stop. The Court therefore allowed the supplement to the Motion.

informed Lee at the beginning of the hearing that he had failed to make the preliminary showing necessary to entitle him to a hearing on the validity of the Warrant Affidavit (<u>Franks</u> hearing).  <u>See</u> <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978).  The Court, therefore, limited the hearing to the challenges to the First Stop.  Counsel for Lee informed the Court that she intended to present additional evidence in the hearing on the First Stop to support Lee's challenge to the validity of the Warrant Affidavit.  The Court allowed counsel to present such evidence.

After carefully considering the motion, the memoranda of the parties, all of the evidence, and the arguments of counsel, the Court is convinced the First Stop was valid, both the initial traffic and the search of the Accord, and Lee failed to present sufficient evidence to entitle him to a <u>Franks</u> hearing to test the validity of the Warrant Affidavit.

A.    <u>The First Stop</u>

Defense counsel orally supplemented the Motion at the hearing to challenge to the validity of the initial traffic stop at the First Stop.  The decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred.  <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996).  As long as the officer has

probable cause to stop the vehicle, his subjective motives are irrelevant. Id. at 813.  Moreover, it is well-established that probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense." United States v. Cashman, 216 F.3d 582, 586 (7th Cir. 2000).

The evidence supports the conclusion that Deputy Tuttle had probable cause to believe that Lee was violating Illinois traffic laws at the time that he initiated the traffic stop of the Accord on December 2, 2009. Deputy Tuttle testified that he ran the Accord license plate through the LEADS system and was informed that the registration was suspended.  It is unlawful to drive a vehicle on the public roads in Illinois with a suspended registration.  625 ILCS 5/3-708.   Deputy Tuttle initiated the traffic stop because Lee was driving the Accord on the public roads with a suspended registration.  The stop of the vehicle did not violate the Fourth Amendment.

Lee argues that the initial traffic stop became an illegal detention because the officers detained him an unreasonable length of time.  The Court disagrees.   A person can be detained briefly during a legal traffic stop, and officers can conduct limited investigations during such a detention, including using a drug sniffing dog to detect the odor of drugs.

<u>Illinois v. Caballes</u>, 543 U.S. 405, 407-08 (2005).  The stop can become an illegal detention if the person is detained longer than reasonably necessary to complete the legitimate purpose of the stop.  <u>Id.</u> at 407-08.

The detention based on the traffic stop here was brief and reasonable.  Lee was stopped at 10:18 a.m.  Deputy Tuttle deployed Keej at approximately 10:21 a.m., and he alerted shortly thereafter.  Lee was detained only four minutes before Deputy Tuttle deployed the dog.  Such a brief delay until a drug sniffing dog is deployed is reasonable.  <u>See</u> <u>United States v. Carpenter</u>, 406 F.3d 915, 916-17 (7th Cir. 2005) (a five-minute delay until the dog arrived at the scene was reasonable).  Once Keej alerted, the detention was not based on the traffic stop, but on probable cause that the Accord contained drugs.[4]  This limited detention until the officers had probable cause was reasonable.

Lee argues that the officers did not have probable cause to conduct the search at the First Stop.  Officers may search a vehicle if they have probable cause to believe that there is contraband in the vehicle.  <u>Carroll v. United States</u>, 267 U.S. 132, 153-56 (1925).  An alert on a vehicle by a

_____

[4]Even then, the entire length of the stop was brief.  Lee was on his way with a courtesy ride to the rest stop at 10:47 a.m., just less than thirty minutes after the initial traffic stop began.

drug sniffing dog can provide probable cause to search an automobile.

See e.g., United States v. Patterson, 65 F.3d 68, 71-72 (7th Cir. 1995).

Lee argues that Keej did not alert on the Accord. Deputy Tuttle, however,

testified that the dog alerted on the Accord, and Lee did not submit any

contradictory evidence at the hearing.[5] Deputy Tuttle and Keej were

trained and certified to work together to detect drug odors. His testimony

that the dog alerted on the passenger door is credible. The officers

therefore had probable cause to search the vehicle because the dog

alerted.

Lee last argues that the search exceeded the scope allowed for a

search incident to arrest. Lee cites Arizona v. Gant, __ U.S. __, 129 S.Ct.

1710 (2009), for the proposition that the scope of the search is limited to

areas in which Lee could have grabbed a weapon. Lee is incorrect. The

Gant case addressed a search of a vehicle incident to an arrest. The

search during the First Stop was not incident to an arrest. The search was

based on probable cause that the vehicle contained drugs. Once officers

have probable cause to believe a vehicle contains contraband, the officers

---

[5]The Motion includes as an exhibit an affidavit from Lee in which Lee states that he did not observe the dog react in any way or make any sound while walking around the car. Motion, attached Affidavit of Eddie Lee ¶ 6. The affidavit, however, was not admitted into evidence at the hearing and Defendant Lee elected not to testify at the hearing.

may search all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments and trunks.  Patterson, 65 F.3d at 70.  The Gant limitations on searches incident to arrest are not relevant here.  The search at the First Stop was valid.  The First Stop, therefore, did not taint the validity of the second search performed pursuant to a warrant.

B.    Warrant Affidavit

Lee also challenges the validity of the Warrant Affidavit submitted to secure the warrant to search the Accord.  The Warrant Affidavit is presumed to be valid.  To secure a hearing to challenge the validity of the Warrant Affidavit, Lee must make a preliminary showing that the affiant, Special Agent Smith, made a material false statement in the Warrant Affidavit knowingly or intentionally, or in reckless disregard for the truth. Franks, 438 U.S. at 155-56; United States v. Johnson, 580 F.3d 666, 670 (7th Cir. 2009); United States v. Maro, 272 F.3d 817, 821  (7th Cir. 2001); United States v. Jones, 208 F.3d 603, 607 (7th Cir. 2000); United States v. Pritchard, 745 F.2d 1112, 1116 (7th Cir. 1984).  It is not enough to prove that someone, such as the CS or Deputy Tuttle, lied to Special Agent Smith.  Lee must present evidence that Special Agent Smith knew the

information in the Warrant Affidavit was false, or that Special Agent Smith included the information recklessly "because he seriously doubted or had obvious reasons to doubt the truth of the allegations." Johnson, 580 F.3d at 670.

Lee argues in his Motion and memoranda that the Warrant Affidavit contains contradictory statements and statements by the CS that are uncorroborated. Lee argues that the following information in the Warrant Affidavit is contradictory:

(1)    The CS stated that Lee drove a black Honda or Toyota at one point in time, but officers later observed Lee driving a grey Taurus; and

(2)    The CS stated that Lee was supposed to go to Jacksonville on November 27 or 28, 2009, but later stated that the CS agreed to give Hurt a ride to Jacksonville on November 25, 2009, to pick up drugs. The trip on November 27 or 28 never occurred.

Defendant Lee's Reply to the Government's Response to the Motion to Quash Arrest and Suppress Evidence (d/e 40) (Reply), at 6-7. Lee argues that all of the CS's statements in the Warrant Affidavit were

uncorroborated, including the two listed immediately above, and the following:

(1)    The statement that Lee drove a black Honda or Toyota in the past;

(2)    The statement that Lee supplied drugs to Hurt or others; and

(3)    The statement that Lee had drugs in the Accord on December 2,
       2009.

Id. at 6-8.

Lee argues that Special Agent Smith also included a misleading statement in the Warrant Affidavit that Lee had a criminal history for drugs. Lee argues that the statement is misleading because he had one conviction for possession of cocaine and three prior arrests for possession of narcotics. Lee argues that this is criminal history of drug use, not drug trafficking. Id. at 8-9.

Defense counsel argued at the hearing that the evidence showed additional infirmities in Warrant Affidavit. Defense counsel argued that:

(1)    the Warrant Affidavit only stated that Deputy Tuttle's dog Keej alerted
       on the Accord and omitted the fact that the dog alerted on the
       passenger door;

(2)     The Warrant Affidavit erroneously stated that there were three cell
        phones in the Accord when Detective Witkowski testified that he saw
        only one cell phone;

(3)     The Warrant Affidavit stated that part of the carpet in the trunk was
        removed to reveal the fuel sending unit, but no evidence at trial
        indicated that any carpet was removed from the trunk;

(4)     Deputy Tuttle falsely stated that he did not disassemble components
        of the Accord at the First Stop when the officers, in fact, removed the
        cover from the spare tire well; and

(5)     The Warrant Affidavit falsely stated that Detective Renken spoke to
        Brad Brown about the Accord because Brown denied being
        interviewed for a warrant and did not recall whether he spoke to an
        officer about the Accord.

Lee's argument fails to meet the minimum level required to merit a
Franks hearing. Lee presents nothing to show that Special Agent Smith
knew that any statement in the Warrant Affidavit was false, or that he made
any statement recklessly. Lee presents no evidence to indicate a knowing
falsehood.  Lee also presents no evidence that Special Agent Smith

seriously doubted or had obvious reasons to doubt the truth of any statement in the Warrant Affidavit.

No evidence indicates that Special Agent Smith seriously doubted or had obvious reasons to doubt the CS. Contrary to Lee's argument, the information from the CS in the Warrant Affidavit is consistent. The fact that Lee drove a Honda one time and a Taurus another is not a contradiction. Also, the reliability and credibility of the CS are corroborated. His reliability is corroborated by the two controlled buys from Hurt. His credibility is corroborated by information from the CS 2 that Michael Smith was distributing drugs and that he secured drugs from Hurt, and by law enforcement officers' observations of Lee at Hurt's residence in Springfield and at the residence of Michael Smith's mother in Springfield.

Special Agent Smith's statement in the Warrant Affidavit about Lee's drug history in the Warrant Affidavit is accurate. He had a drug conviction and prior drug arrests. The Warrant Affidavit did not state that Lee had a criminal history for drug trafficking. The statement is not misleading.

More important, defense counsel never cited any evidence to indicate that Special Agent Smith knew about any of these omissions or

inconsistencies.[6]  The additional claimed misstatements and omissions were all based on information provided by Deputy Tuttle and Detective Renken.  Lee presented no evidence that Special Agent Smith had any reason to doubt information provided by these two law enforcement officers.

In sum, Lee presents no evidence that Special Agent Smith knowingly or recklessly included false information in the Warrant Affidavit. Lee, therefore, fails to make the necessary preliminary showing to entitled him to a <u>Franks</u> hearing.

## III. CONCLUSION

For all the above reasons, it is recommended that Defendant's Motion to Quash Arrest and Suppress Evidence (d/e 30) be DENIED. The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within

---

[6]Most of these alleged omissions and misstatements are of little consequence: the number of cell phones in the Accord is not important in this case; whether Detective Renken spoke to Brad Brown or someone else at Brown's is trivial; and lifting up the spare tire well cover does not constitute disassembling components of a vehicle.  The omission of the fact that the dog alerted on the passenger door was not material because of Deputy Tuttle's testimony that the location of the alert did not indicate the location of the contraband in the vehicle, but only the point where the odor was emanating from the vehicle. The statements regarding the carpet cut away near the fuel sending unit had some relevance because the statement provided some basis to believe the trunk may have been modified to contain a hiding place for contraband, although this was a very minor point in a very extensive affidavit.

fourteen days after being served with ECF copy of this Report and

Recommendation. <u>See</u> 28 U.S.C. § 636(b)(1). Failure to file a timely

objection will constitute a waiver of objections on appeal. <u>See</u> <u>Video</u>

<u>Views, Inc. v. Studio 21, Ltd.</u>, 797 F.2d 538, 539 (7th Cir. 1986);

<u>Local Rule</u> 72.2.


ENTER: November 10, 2010


_____*s/ Byron G. Cudmore*_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE